**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| NEXII BUILDING SOLUTIONS INC., et al.,[1] | Case No. 24-10026 |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Nexii Building Solutions, Inc., in its capacity as the authorized foreign representative ("NBSI" or the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors"), which are the subject of jointly-administered proceedings under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Supreme Court of British Columbia (the "CCAA Proceedings"), submits this verified petition (together with the form petitions filed concurrently herewith, the "Verified Petition") for recognition of the CCAA Proceedings with respect to each of the Debtors as "foreign main proceedings" and certain related relief pursuant to sections 105(a), 1507, 1510, 1515, 1517, and 1521 of title 11 of the United States Code (the "Bankruptcy Code").

**Relief Requested**

1.      In support of the Verified Petition, the Foreign Representative has filed contemporaneously herewith (a) the *Declaration of Foreign Representative Pursuant to 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of*

---

[1]      The Debtors in these chapter 15 cases (the "Chapter 15 Cases"), along with the last four digits of each Debtor's unique identifier, are Nexii Building Solutions Inc. (0911), Nexii Construction Inc. (1333), NBS IP Inc. (9930), and Nexii Holdings Inc. (5873).  The Debtors' service address for purposes of these Chapter 15 Cases is 1455 West Georgia Street, #200, Vancouver, British Columbia V6G 2T3.

*Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Tucker Declaration") and (b) the *Declaration of Kibben Jackson in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Jackson Declaration"), each of which are incorporated herein by reference.

**Preliminary Statement**

2.     NBSI, Nexii Construction Inc. ("Nexii Construction"), NBS IP Inc. ("NBS IP"), and Nexii Holdings Inc. ("Nexii US" and, together with Nexii Construction, NBS IP, and NBSI, "Nexii") are a green construction company that manufacture Nexiite, a proprietary material that is a sustainable alternative to conventional concrete which is formed into panels used in construction projects. Nexiite is strong and lightweight—weighing 15 – 20% less than precast concrete alternatives— in addition to being recyclable, energy efficient, and resistant to fire, water, and mold. Nexiite is a low-carbon alternative to concrete that, since 2010, has been installed in numerous buildings, including new-builds and retrofits of both industrial and commercial structures.

3.     The Debtors face significant liquidity constraints and are in default of approximately $79 million[2] owing, collectively, to various creditors, including suppliers and their primary secured creditors. The Debtors require immediate additional funding to meet operating expenses, including their next payroll cycle, which is paid in arrears and scheduled to be paid on January 12, 2024. However, the Debtors' only viable source of funding at this time is from the Senior Secured Lenders (as defined below), who have advised that they are unwilling to advance further funds without a clear path to selling the business through an orderly, court-supervised sale

---

[2]     Unless otherwise noted, all amounts are provided in U.S. Dollars.

process (the "Sale Process").

4.      With the support of the Senior Secured Lenders, the Debtors[3] commenced the CCAA Proceedings on January 11, 2024 and these proceedings to obtain financing to meet critical expenses and to facilitate the sale (or sales) of the businesses as a going concern.  Doing so will preserve value and, to the extent possible, operations as a going concern, to the benefit of stakeholders in Canada and the United States, including employees, customers, suppliers, and contracting parties.

5.      On January 11, 2024, the Debtors commenced the CCAA Proceedings with the Supreme Court of British Columbia (the "Canadian Court") pursuant to the CCAA with the goal of pursuing the Sale Process and restructuring operations under the protections offered by the CCAA.  On January 11, 2024, the Canadian Court entered an interim order (the "Initial CCAA Order").  Among other things, the Initial CCAA Order provides for (i) the appointment of KSV Restructuring Inc. ("KSV" or the "Monitor") as the monitor with enhanced powers; (ii) a stay of proceedings against the Debtors; (iii) the continued implementation of the Debtors' cash management system; (iv) the provision of debtor in possession financing from the Senior Secured Lenders (the "DIP Financing"); and (v) various administration and directors' charges.  In addition, the Initial CCAA Order scheduled a further hearing (the "Comeback Hearing") for January 22, 2024 at 10:00 a.m. (prevailing Pacific time), at which hearing the Debtors will seek the approval of an amended and restated initial order (the "Amended and Restated Initial CCAA Order"), approval of procedures to govern the Sale Process, and the approval of a key employee retention

---

[3]      Certain of the Debtors' affiliates—Omicron Canada Inc., Omicron Construction Management Ltd., Omicron Consulting Ltd., Grant & Sinclair Architects Ltd., Omicron Interiors Ltd. and Omicron Construction Ltd. (collectively, the "Omicron Entities")— are neither petitioners in the CCAA Proceeding nor Debtors in these Chapter 15 Cases. The Omicron Entities are in the business of design, building and construction of large commercial and residential projects in Western Canada.  The Omicron Entities were founded in 1998, and NBSI acquired the Omicron Entities in 2021.

plan ("KERP"), among other relief.

6.       The Debtors have now commenced these Chapter 15 Cases to facilitate the fair and efficient administration of the CCAA Proceedings and to complete the Sale Process for their assets. These Chapter 15 Cases serve a critical role in effectuating the sale of the Debtors' business and assets which will be implemented as part of an extensive process conducted through the CCAA Proceedings.   Specifically, these Chapter 15 Cases will prevent the Debtors' stakeholders, many of whom have contacts with the United States and are subject to personal jurisdiction of the Court, from commencing actions in the United States that are more properly the subject of the CCAA Proceedings or that will interfere with the Debtors' restructuring process.   Recognition of the CCAA Proceedings will, among other things, ensure that the Sale Process, as implemented through the CCAA Proceedings, is respected in the United States.   For the reasons set forth herein, the Foreign Representative submits that the relief requested in this Verified Petition is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.

7.       Accordingly, the Foreign Representative respectfully requests entry of an order (the "Order"): (a) granting the Verified Petition and recognizing the CCAA Proceedings as "foreign main proceedings," pursuant to section 1517 of the Bankruptcy Code; (b) recognizing the Foreign Representative as a "foreign representative" of the Debtors as defined in section 101(24) of the Bankruptcy Code; (c) recognizing and enforcing the Initial CCAA Order and the Amended and Restated Initial CCAA Order; (d) applying sections 361, 362, and 365(e) of the Bankruptcy Code in these Chapter 15 Cases pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code; (e) finding that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code; (f) providing that no action taken by the Foreign Representative in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the CCAA

Proceedings and Sale Process, any order entered in respect of this Verified Petition, these Chapter 15 Cases, any further order for additional relief in these Chapter 15 Cases, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code; and (g) granting such other relief as the Court deems just and proper.[4] A proposed form of the Order is attached hereto as **Exhibit A**.

### Jurisdiction and Venue

8.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order").   The Foreign Representative confirms its consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with the Verified Petition to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.     These Chapter 15 Cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of petitions for recognition of the CCAA Proceedings under section 1515 of the Bankruptcy Code.

10.     Venue is proper pursuant to 28 U.S.C. § 1410(1) and (3).  Of the four Debtors, one is incorporated in Delaware, and the Debtors otherwise have property in Delaware in the form

---

[4]     The Foreign Representative has also filed the *Motion for Provisional Relief Pursuant of Section 1519 of the Bankruptcy Code* (the "Provisional Relief Motion") concurrently herewith.

of contract rights, corporation stock, and funds on retainer with Delaware counsel or have affiliates whose Chapter 15 Cases are pending in this district.

11.    The statutory bases for the relief requested herein are sections 105(a), 1504, 1507, 1510, 1515, 1517, and 1521 of the Bankruptcy Code.

## Background

### I.    The Debtors' Corporate Structure and Leadership.

12.    NBSI, a corporation incorporated in British Columbia, Canada, is the direct parent of each of the other three Debtors.  Nexii Construction and NBS IP are corporations incorporated in British Columbia, Canada and Nexii US is a corporation incorporated in Delaware.  Nexii US employs Nexii's five US-based employees, but it does not have significant assets and all US contracts are with NBSI.  In addition, NBSI is the direct or indirect parent of six other entities (collectively, the "Omicron Entities"), none of which are petitioners in the CCAA Proceedings or Debtors in these Chapter 15 Cases.  The Debtors' and Omicron Entities' organizational chart is as follows:



13.    NBSI's equity, though not publicly traded, is widely held; as of the Petition Date, there are approximately 1,500 holders of NBSI's common stock.

14.     In the months leading to the commencement of the CCAA Proceedings, the Debtors had a number of senior management changes, including the departures of their former Chief Executive Officer, Executive Vice President of Manufacturing, Vice President of Investor Relations, and Vice President of Finance.  As of the Petition Date, the senior management of the Debtors are William Tucker (the Acting Chief Executive Officer) and David Bryant (a Senior Executive Advisor).

## II.     The Debtors' Business Operations.

### A.     Overview.

15.     The Debtors are a green construction company that uses its proprietary material, Nexiite, to manufacture high performance cladding and structural wall panels ("Nexiite Panels") which are used in the construction of high-performance buildings.  The Nexiite Panels and their construction configurations are lightweight, more sustainable than concrete, and result in buildings that are recyclable, energy efficient, and resistant to fire, water, and mold.  Nexiite is a low-carbon alternative to concrete that, since 2010, has been installed in numerous buildings, including new-builds and retrofits in both commercial and industrial structures.

16.     As of the Petition Date, the Debtors have leases for a main office in Vancouver, British Columbia (the "Vancouver Headquarters"), a manufacturing facility in Squamish, British Columbia (the "Squamish Facility"), and a manufacturing facility in Moose Jaw, Saskatchewan (the "Moose Jaw Facility").  Other than the Squamish Facility, the Debtors no longer require these premises as the Debtors no longer perform active operations in the Vancouver Headquarters and Moose Jaw Facility.

17.     As of December 20, 2023, Debtor NBSI has 137 employees, 75 of whom work at the Squamish Facility and 62 work at the Vancouver Headquarters.  Debtor Nexii US has five

employees in the United States, all of whom work remotely. Debtors Nexii Construction and NBS IP have no employees.

**B.      The Debtors' Assets.**

18.      In addition to Nexiite Panels and their other operating assets, the Debtors' other assets include intellectual property and various contracts for projects, including use of Nexiite. As of November 30, 2023, Nexii's assets had a total estimated book value of approximately CA$69 million. Below is the summary from Nexii's most recent balance sheet dated as of November 30, 2023:

| Description | Book Value (CAD, $000s) |
|---|---|
| Cash | 3,163 |
| Accounts receivable | 4,579 |
| Inventory | 2,595 |
| Prepaid expenses and deposits | 2,405 |
| Property, plant and equipment | 25,373 |
| Intangible assets | 895 |
| Investment | 30,662 |
| Other assets | 320 |
| **Total Assets** | **69,992** |
| | |
| Accounts payable and accrued liabilities | 15,416 |
| Contract liabilities, refundable deposits and provisions | 4,031 |
| Lease obligations | 13,297 |
| Long-term debt | 96,173 |
| Net Due to Intercompany | 1,462 |
| Preferred shares and subscription deposits | 12,930 |
| Derivative liabilities | 4,921 |
| Due to related parties | 4,408 |
| **Total Liabilities** | **152,638** |
| **Equity** | **(82,646)** |
| **Total Liabilities & Equity** | **69,992** |

III.     **The Debtors' Capital Structure.**[5]

    A.     **Senior Secured Loans.**

19.     The Debtors'[6] primary secured creditors are Powerscourt Investments XXV, LP ("PC LP") as lender, Powerscourt Investments XXV Trust as assignee of PC LP as lender, Trinity Capital Inc. as lender, Horizon Technology Finance Corporation ("Horizon") as lender, Horizon Credit II LLC as assignee of Horizon as lender, Horizon Funding I LLC as assignee of Horizon as lender, and Horizon Funding Trust 2022-1 as assignee of Horizon as lender (collectively, the "Senior Secured Lenders").

20.     The Debtors' debt to the Senior Secured Lenders is for loans and credit facilities (collectively, the "Loans") made available pursuant to, among other things, an Amended and Restated Venture Loan and Security Agreement dated as of June 8, 2022 (as amended from time to time, the "Loan Agreement") entered into between Horizon, as collateral agent for and on behalf of the Senior Secured Lenders, each of the Senior Secured Lenders, and the Debtors and Omicron Entities.

21.     The Senior Secured Lenders advanced nine loans under the Loan Agreement in the aggregate principal amount of $60,000,000.  Each of the Senior Secured Lenders have advanced Loans, documented in promissory notes.  As among the Senior Secured Lenders, there have been various assignments of the right, title, and interest in and to the Loans.

22.     The Senior Secured Lenders advanced nine loans under the Loan Agreement in the aggregate principal amount of $60,000,000.  Each of the Senior Secured Lenders have advanced

---

[5]     The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

[6]     The Omicron Entities are also obligors on the Loans (as defined herein).

Loans, documented in promissory notes.  As among the Senior Secured Lenders, there have been various assignments of the right, title, and interest in and to the Loans.

23.     Following the failure to pay amounts due and owing under the Loan Agreement, the Senior Secured Lenders noticed events of default under the Loan Agreement and made a formal demand for payment in a letter dated June 21, 2023 to the Debtors (the "Demand").  According to the Demand, the Debtors owed approximately $66 million in principal and interest to the Senior Secured Lenders as of such date, plus accruing interest and costs (the "Indebtedness").

24.     The Debtors and Senior Secured Lenders entered into an accommodation agreement on June 21, 2023 (the "Accommodation Agreement").  As part of the Accommodation Agreement, the Senior Secured Lenders agreed to make additional funds available to the Debtors in multiple tranches, up to $5 million, but ultimately advanced an aggregate sum of $7,000,000 in the form of secured promissory notes. The key terms of the Loan Agreement and the Accommodation Agreement included: (a) interest at a rate of the prime rate published in the Wall Street Journal, plus 7.00% per annum (with a minimum rate of 10.25% per annum); (b) upon an event of default, the interest rate increases by 5.00% per annum; (c) upon an event of default under the Loan Agreement or the Accommodation Agreement, all amounts owing become immediately due and payable; and (d) each of the Debtors and Omicron Entities is joint and severally liable for all obligations owing under the Loan Agreement.

25.     Following the expiration of the Accommodation Agreement and related forbearance, the Debtors notified the Senior Secured Lenders of continued, significant liquidity constraints and the inability to continue operations without additional financing.  In response, the Senior Secured Lenders advised the Debtors that they were unwilling to advance further funds without a clear path to selling the business through an orderly, court-supervised process.

26.     In order to maintain sufficient liquidity and stability, the Debtors and the Senior Secured Lenders entered into an Amended and Restated Accommodation Agreement effective December 15, 2023 (the "A&R Accommodation Agreement").   Pursuant to the A&R Accommodation Agreement, the Senior Secured Lenders agreed to make additional funding available and forbear from exercising their rights and remedies, provided certain conditions were met.  These conditions included commencing the CCAA Proceedings in the Canadian Court and a chapter 15 proceeding in the United States for recognition of the CCAA Proceedings thereafter.

27.     As of January 2, 2024, the Debtors owe the Senior Secured Lenders approximately $79 million and are in default under agreements with the Senior Secured Lenders, including: (a) since April 2023, failing to pay amounts owing under the Loan Agreement; and (b) granting unpermitted liens on certain property.

**B.     Other Secured Liabilities.**

28.     In addition to the indebtedness owing to the Senior Secured Lenders, the Debtors also have various leased equipment, including vehicles, office equipment, and industrial machinery. Approximately CA$625,000 remains owing to those creditors.

29.     For certain projects, the Debtors are required to obtain project bonding. Accordingly, in March 2023, the Debtors entered into an indemnity agreement in favour of Tokio Marine Canada ("TMC") in connection with bonds issued by TMC.  The indemnity agreement included a security interest in favour of TMC.  Nexii also has an indemnity agreement with Trisura Guarantee Insurance Company ("Trisura") for bonds issued by Trisura.  If the Debtors are unable to continue their operations, the bonds would likely be drawn, triggering corresponding liability of the Debtors under the indemnity agreement of approximately CA$2 million.

C.      **Unsecured Creditors.**

30.     The Debtors are behind on approximately CA$5.6 million owing to various trade creditors and service providers.

31.     NBSI is in default of amounts owing to its landlord for the Vancouver head office, with approximately CA$950,000 owing in base rent arrears.

32.     In addition to certain litigation pending against the Debtors in Canada, the following legal actions involving NBSI are pending in the United States:

> a.     *Nexii Building Solutions Inc. v. NexUS 1, LLC et al.*, Case No. 1:22-cv-01619-RGA (D. Del. December 22, 2022)
>
> b.     *Nexus 1, LLC et al. v. Sidwell et al.*, Case No. 2:23-cv-00216-KNS (E.D. Pa. January 19, 2023)
>
> c.     *Nexii Building Solutions Inc. v. Nexus 1, LLC et al.*, Case No. 2:23-cv-00398-MMB (E.D. Pa. January 31, 2023)

IV.     **Prepetition Financial Distress and Ongoing Restructuring Efforts.**

33.     Beginning in 2021, the Debtors pursued aggressive growth, including expansion of their facilities and operations. The financing from investors and the Senior Secured Lenders funded this expansion.

34.     The Debtors' expansion included a license pursuant to a Nexii Certified Manufacturing Agreement for a manufacturing facility in Pennsylvania. The counterparty under this agreement did not pay their initial licensing fee (CA$5 million) and was unable to perform due to lack of working capital. The agreement ultimately came at significant cost to Nexii. Nexii worked, with no compensation, for over a year, to assist in delivering the contracted business under the Certified Manufacturing Agreement in order to protect the Nexii brand from potential project defaults.

35.     Following this expansion effort, Nexii's business grew, but not to the extent

anticipated, and the costs were high relative to revenue. The Debtors were also unable to service their obligations under the Loan Agreement.

36.     In 2021, Nexii realized that the product cost structure required significant rework to achieve a competitive price position in the marketplace. Over the past two years, Nexii has performed extensive redesign and testing necessary to reengineer the product so that it was competitive and profitable in the marketplace. Although the company was successful in the reengineering, and the product demonstrated strong profitability in late in 2023, Nexii had consumed significant capital over the prior 24 months.

37.     Despite these challenges, senior management believes that Nexii has significant value, and the underlying business has strong potential now that Nexiite has been successfully reengineered. In particular, senior management believes that the proprietary materials and technology have value in today's market, where a premium is being placed on sustainable and environmentally conscious building practices.

38.     In response to its financial challenges, Nexii reduced its costs, and began discussions with the Senior Secured Lenders, including to develop a strategy to preserve value. These cost reduction steps included: (a) two staff-level adjustments (in January 2023 and fall 2023) that resulted in the termination of over 40% of NBSI's staff; (b) shutting down operations at the Moose Jaw Facility; and (c) significantly reducing selling, general and administrative expenses.

39.     Despite these steps, in or about April 2023, and as described above, the Debtors failed to make the scheduled payment owing under the Loan Agreement, and their defaults have continued through to the present.

40.     As noted above, following these missed payments, the Senior Secured Lenders issued the Demand in June 2023. Accordingly, Nexii has been in ongoing discussions with the

Senior Secured Lenders regarding the appropriate next steps and funding requirements. The Senior Secured Lenders have made incremental funding available and entered into the Accommodation Agreement in June 2023 and the A&R Accommodation Agreement in December 2023.

41.    Nexii requires additional funding to meet critical obligations (including payroll), which, at this time, will only be available in these proceedings through an interim financing facility (the "Interim Loan"), secured by a charge in the CCAA Proceedings.

42.    The Debtors and the Senior Secured Lenders entered into a restructuring support term sheet (the "Support Term Sheet"), pursuant to which the Senior Secured Lenders agreed to support Nexii in commencing the CCAA Proceedings and these Chapter 15 Cases. The Support Term Sheet contemplates, among other things, commencing insolvency proceedings in Canada and the United States and provision of certain interim financing.

43.    Such proceedings and financing is necessary because if the Senior Secured Lenders were to enforce their rights under the Loan Agreement, it would likely be destructive to the business and value of the Debtors. In particular, the value and continuity of certain contracts would be jeopardized and at risk in enforcement proceedings.

## V.    The CCAA Proceedings.

44.    On January 11, 2024, with the support of the Senior Secured Lenders, the Debtors commenced the CCAA Proceedings with the Canadian Court pursuant to sections 9, 11, 11.51, 11.52, and 23 of the CCAA with the goal of facilitating an expeditious, orderly Sale Process to facilitate the sale (or sales) of the business as a going concern and maximize the value of the Debtors' assets for all parties.

**A.    Overview of Initial Relief Obtained in CCAA Restructuring Process.**

45.    The Debtors sought the following relief through their initial application in the Canadian Proceeding:

a.    ***Appointment of Monitor and Enhanced Powers.*** The Debtors obtained approval an order appointing KSV Restructuring Inc. ("KSV") as Monitor of the Debtors in the CCAA Proceedings and for KSV's powers to include, among other things, the ability to exercise of any powers of the Debtors' boards of directors and to cause the Debtors' to perform such functions as KSV considers necessary to facilitate the Sale Process and the ultimate winding-down and liquidation of the Debtors, as applicable.

b.    ***Stay of Proceedings.*** The Debtors obtained a stay of proceedings during the pendency of the CCAA Proceedings both for themselves and for the Omicron Entities.

c.    ***Cash Management System.*** The Debtors were authorized to continue use of their pre-bankruptcy cash management system and fund certain of their ongoing obligations otherwise paid through their existing cash management system.

d.    ***Cash Flow Forecast and Interim Loan Approval.*** The Debtors obtained approval of the Interim Loan on the terms described in the Interim Facility Term Sheet and summarized below:

| Summary of Certain Key Terms of the DIP Loan[7] | |
|---|---|
| Lenders | Powerscourt Investments XXV Trust, Trinity Capital Inc., Horizon Technology Finance Corporation and Horizon Credit II LLC |
| Borrowers | The Petitioners, jointly and severally. |
| Maximum Availability | Maximum Amount: $4,300,000 (non-revolving) <br> Initial Advance: $750,000 |
| Interest | 15.5% per annum, compounded and calculated weekly; added to the principal amount on the first day of each month |
| Fees | 2% of the Maximum Amount ($86,000) <br> Payable: $15,000 from the Initial Advance, and the balance payable from the first advance after the Amended and Restated Initial Order is made authorizing the Maximum Amount |

---

[7]    Capitalized terms used but not defined in this summary chart shall have the meaning given to them in the Support Term Sheet. Copies of the Support Term Sheet will be made available to the Court or appropriate parties in interest upon written request to the Debtors' counsel.  The Support Term Sheet may also be found on the Monitor's website at www.ksvadvisory.com/experience/case/Nexii.

| Summary of Certain Key Terms of the DIP Loan[7] | |
|---|---|
| Costs and Expenses | All reasonable and documented fees, costs and expenses of the Interim Lenders, including legal fees and financial advisor, that are incurred in connection with these CCAA proceedings. |
| Use of Funds | In accordance with cash flow projections, and include costs of the CCAA proceedings, operating expenses and amounts payable under the Interim Facility Term Sheet. |
| Maturity | April 30, 2024, unless extended by the Interim Lenders (in their discretion) or terminated earlier because of, among other things, an Event of Default, closing of a transaction for all or substantially all of the assets and business of the Borrowers. |
| Certain Key Conditions Precedent to Initial Advance | • Bringing the application for the Initial Order no later than January 11, 2024<br>• KSV Restructuring Inc. being appointed as Monitor, with powers as are acceptable to the Interim Lenders (in their sole discretion)<br>• The Borrowers engaging the IB prior to the Initial Order to assist in the Sale Process<br>• The Initial Order is made and approves the Initial Advance and grants a charge for the Initial Advance<br>• The Interim Lenders' Charge has priority over all Liens, except the Charges<br>• The Initial Cash Flow Projections shall be acceptable to the Interim Lenders |
| Certain Key Conditions Precedent to Subsequent Advances | • Bringing the application for the Amended and Restated Initial Order no later than January 22, 2024<br>• The Amended and Restated Initial Order is made and approves the Maximum Advance and increased the charge to secure all amounts owing under the Interim Facility Term Sheet<br>• The Interim Lenders' Charge shall have priority over all Liens, except for the Charges<br>• The amounts requested are consistent with the Updated Cash Flow Projects, unless otherwise agreed by the Interim Lenders in advance<br>• The Sale Process terms and conditions, including milestones, are approved by the Court in form and substance satisfactory to the Monitor and the Interim Lenders<br>• All representations and warranties are true, and there are no events of default<br>• The Borrowers bring a motion to obtain Chapter 15 Recognition of the CCAA proceedings no later than February 2, 2024 |

| Summary of Certain Key Terms of the DIP Loan[7] | |
|---|---|
| Events of Default | Events of Default include:<br>1. Failure to pay amounts when due under the Interim Facility Term Sheet or any other breach of covenants<br>2. If the Sale Process is not made by January 22, 2024<br>3. If I resign as CEO of Nexii prior to the Maturity Date<br>4. If the cumulative disbursements and receipts have a variance of greater than 15% of the cumulative budget, measured on a weekly basis<br>5. If the Interim Facility Term Sheet or related documents cease to be effective or are contested by a Borrower<br>6. The CCAA Proceedings are terminated or converted into proceedings under the BIA, or an order is made granting relief from the stay of proceedings (unless agreed by the Interim Lenders)<br>7. The Borrowers make material payments that aren't permitted under the Interim Facility Term Sheet, the Cash Flow Projections or any Court order<br>8. The Borrowers make any distributions or payments to the Omicron Entities |
| Security and Interim Lenders' Charge | The Interim Lenders' Charge, covering all the Borrowers' present and future assets, property and undertaking. |
| Priority of the Interim Lenders' Charge | In priority to all other security interests, encumbrances and charges except for (i) the Administration Charge, (ii) the Directors' Charge, (iii) the KERP Charge, and (iv) the IB Charge. |

e.    ***Administration Charge.***    The Debtors obtained approval of a priority charge over their assets in favor of their counsel, the Monitor, and the Monitor's counsel (the "Administration Charge") in the initial amount of CA$500,000 as the Debtors require the expertise, knowledge, and continuing participation of their counsel, the Monitor, and the Monitor's counsel in the CCAA Proceedings and these Chapter 15 Cases.

f.    ***Directors' Charge.*** The Debtors obtained approval of a charge in the amount of CA$1,040,000 over the Debtors' Property (the "Directors' Charge") to secure the indemnity of the Directors and Officers in respect of obligations and liabilities that they may incur during the CCAA Proceedings in their capacities as Directors and Officers.

46.    On January 11, 2024, the Canadian Court entered the Initial CCAA Order.  The

Initial CCAA Order includes a "no default" provision as follows:

The granting of this Order, the Application and any affidavits and other materials filed in support of the Application shall not, in in and of themselves, constitute a

default or failure to comply by the Debtors under any statute, regulation, licence, permit, contract, permission, covenant, agreement, undertaking or other written document or requirement.

Initial CCAA Order, ¶ 18.

47.     In addition, the Initial CCAA Order expressly requests that courts in the United States recognize the CCAA Proceedings to aid and assist the Canadian Court in carrying out the terms of the Initial CCAA Order.  Paragraphs 52 and 53 of the Initial CCAA Order provides, in relevant part:

> **THIS COURT REQUESTS** the aid and recognition of other Canadian and foreign Courts, tribunal, regulatory or administrative bodies, including any Court or administrative tribunal of any federal or State Court or administrative body in the United States of America, to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Petitioners and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Petitioners and the Monitor and their respective agents in carrying out the terms of this Order.
>
> Each of the Petitioners and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order and Nexii Business Solutions Inc. is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada, including acting as a foreign representative of the Petitioners to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the *United States Bankruptcy Code*, 11 U.S.C. §§ 101-1330, as amended.

*Id.* at ¶¶ 55 – 56.

48.     Recognition of the CCAA Proceedings will not undermine the rights that United States creditors typically enjoy in a chapter 11 proceeding, as affected creditors will have the opportunity to the participate in the sales process and the CCAA Proceedings under the supervision of the Canadian Court.

**B.      Overview of Relief to be Sought at the Comeback Hearing.**

49.      The Debtors will seek the following relief at the Comeback Hearing before the

Canadian Court:

a.      ***Key Employee Retention Plan.***      The Debtors will seek approval of a KERP to
assist with the Sale Process and administration of the CCAA Proceedings.

b.      ***Sale Process.***      The Debtors will seek approval of procedures to govern the
Sale Process.

c.      ***Financial Advisor.*** The Debtors will seek approval to retain Origin Merchant
Partners as their investment banker in connection with the Sale Process and
CCAA Proceedings more broadly.

**VI.    The CCAA Proceedings Are Foreign Main Proceedings.**

50.      To ensure the effective and economic administration of the Debtors' restructuring

efforts, prevent the disruption of business, and recognize the legal effect of the CCAA Proceedings

in the United States, the Debtors require the protection afforded to foreign debtors pursuant to

chapter 15 of the Bankruptcy Code.

**<u>Basis For Relief</u>**

51.      Chapter 15 of the Bankruptcy Code is designed to protect and maximize the value

of a debtor's assets and to facilitate the rehabilitation and reorganization of businesses.

The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could

otherwise derail a debtor's restructuring in its home country.

52.      Consistent with these principles, the Foreign Representative commenced ancillary

proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the

CCAA Proceedings and certain related relief.  The Foreign Representative believes that these

Chapter 15 Cases will complement the Debtors' primary proceedings in Canada to ensure the

effective and economic administration of the Debtors' restructuring efforts and prevent adverse

actions in the United States.   Further, the Foreign Representative submits that recognition  of  the CCAA  Proceedings  and  the  related  relief  requested  herein  will  not undermine the rights that United States creditors typically would enjoy in a chapter 11 proceeding, as creditors will have the right to participate in the CCAA Proceedings.

## I.      The Debtors Are Eligible for Chapter 15 Relief.

53.      Section 109(a) of the Bankruptcy Code provides that "only a person that resides  or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title."   Courts have applied section 109(a) of the Bankruptcy Code to chapter 15 eligibility.   *See, e.g.*, *Drawbridge Special Opp. Fund LP v. Barnett (In re Barnett)*, 737 F.3d 238, 247 (2d Cir. 2013).   Decisions interpreting section 109(a) of the Bankruptcy Code as applied to foreign debtors under other chapters of the Bankruptcy Code unanimously hold that a debtor satisfies the section 109 requirement even when it only has a nominal amount of property in the United States. *See GMAM Inv. Funds Trust 1 v. Globo Comunicacoes e Partipacoes S.A. (In re Globo Comunicacoes e Partipacoes S.A.)*, 317 B.R. 235, 249 (S.D.N.Y. 2004) (stating that  courts have repeatedly found that there is "'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings") (citing *In re Aerovias Nacionales de Colombia S.A. (In re Avianca)*, 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003)); *see also In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 38-39 (Bankr. D. Del. 2000) (holding that approximately $10,000 in  a bank account and the unearned portions of retainers provided to local counsel constituted a sufficient property interest for chapter 15 purposes).   Effectively, if a debtor has any property in the United States, section 109(a) of the Bankruptcy Code is satisfied.

54.      For purposes of satisfying section 109(a) of the Bankruptcy Code's requirement that a debtor must have property in the United States in order to be a debtor, courts have held that

contracts governed by United States law, a retainer held by United States counsel, or claims or causes of action against United States entities are each sufficient to allow a foreign entity to be a chapter 15 debtor. *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 699–700 (Bankr. S.D.N.Y. 2017) ("The Foreign Debtors satisfy section 109(a)'s requirement of property in the United States. Each of the four Foreign Debtors paid its New York counsel a separate $250,000 retainer, for a total of $1 million, currently held in counsel's client trust account in New York, where they will remain pending final billing in these proceedings.); *In re Berau Capital Res. Pte Ltd*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. Oct. 28, 2015) ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the [indenture] satisfies the section 109(a) 'property in the United States' eligibility requirement."); *In re Octaviar Admin. Pty Ltd*, 511 B.R. 361, 370 (Bankr. S.D.N.Y. 2014) ("Octaviar possessed property in the form of claims or causes of action sufficient to satisfy section 109(a) of the Bankruptcy Code.").

55.     Each of the Debtors is eligible to be a debtor under section 109(a) of the Bankruptcy Code because they have property in the United States in the form of tangible assets, corporation stock, contract rights, a retainer in counsel's Delaware trust account, and causes of action arising under United States law.  Finally, one of the Debtors is an entity incorporated in the United States with its principal assets located in the United States.  For these reasons, the Debtors satisfy the requirements under section 109(a) of the Bankruptcy Code.

## II.     The CCAA Proceedings Should Be Recognized as Foreign Main Proceedings.

56.     Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter the Order recognizing a foreign proceeding as a foreign main proceeding if (a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code; (b) the foreign representative applying for recognition is a person or body;

and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code.  *See* 11

U.S.C. § 1517.  As explained below, the CCAA Proceedings, the Foreign Representative, and the

Verified Petition satisfy all of the foregoing requirements.

**A.** **The CCAA Proceedings Are Foreign Proceedings.**

57.  Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

58.  Courts have held that a "foreign proceeding" is one:

   a.   in which "acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;"

   b.   that has either a judicial or an administrative character;

   c.   that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

   d.   that is located in a foreign country;

   e.   that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

   f.   in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

   g.   which proceeding is for the purpose of reorganization or liquidation.

*See In re Agro Santino, OOD*, 653 B.R. 79, 89 (Bankr. S.D.N.Y. 2023) (citing *In re Ashapura

Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012); *see also In re Overnight and Control Comm'n

of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors).  As set forth in

the Jackson Declaration, the CCAA Proceedings satisfy such requirements and, therefore, qualify as "foreign proceedings" for purposes of section 101(23) of the Bankruptcy Code.

59.     *First*, the CCAA Proceedings are proceedings commenced pursuant to the CCAA, a Canadian law that governs corporate reorganizations and provides for an arrangement of a company's financial obligations. *See* CCAA § 44(a–e).  For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *In re Irish Bank Resol. Corp. Ltd.*, 538 B.R. 692, 697 (D. Del. 2015) (quoting *In re Betcorp*, 400 B.R. 266, 278 (Bankr. D. Nev. 2009)). Because the CCAA Proceedings operate under such statutory framework, they satisfy the first factor of section 101(23) of the Bankruptcy Code.

60.     *Second*, the CCAA Proceedings are judicial in character.  A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010).  Here, the Debtors will petition the Canadian Court for an order approving the Sale Process.  After proper notice and hearing, the Canadian Court may then sanction the Sale Process and approve the sale of the Debtors' assets to the winning bidder, having considered the statutory requirements under the CCAA, including the adequacy of the marketing process and any related objections thereto.

61.     *Third*, the CCAA Proceedings are collective in nature in that all affected creditors are allowed to participate.  In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor." *See* 400 B.R. at 281. Here, the Debtors have commenced the CCAA Proceedings after consultation with various parties in interest.   In

addition, affected creditors are entitled to intervene while the Sale Process is implemented and the Canadian Court considers the sale of the Debtors' assets. Importantly, the CCAA Proceedings will not prohibit the Debtors' creditors from participating in the Debtors' restructuring efforts.

62. **Fourth**, the CCAA Proceedings, including the Canadian Court, are located in a foreign country, namely British Columbia, Canada.

63. **Fifth**, as described above, the CCAA, which governs the CCAA Proceedings, relates to the adjustment of debt. Here, the Debtors intend to implement the Sale Process to satisfy various of their pre-bankruptcy funded indebtedness.

64. **Sixth**, the CCAA Proceedings subject the Debtors' assets and affairs to the supervision of the Canadian Court during the pendency of the proceedings.

65. **Finally**, the objective of the CCAA Proceedings is to effectuate a restructuring. Any sale of the Debtors' business and disbursements of the proceeds therefrom will be overseen by the Canadian Court pursuant to the CCAA and the court-appointed Monitor. Therefore, the Foreign Representative submits that the Debtors have commenced the CCAA Proceedings for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code.

66. Since the CCAA Proceedings satisfy all of the criteria required by section 101(23) of the Bankruptcy Code, they are foreign proceedings entitled to recognition under chapter 15 of the Bankruptcy Code. United States courts have frequently recognized collective proceedings similar to the CCAA Proceedings as "foreign proceedings." *See, e.g.*, *In re Lighthouse Immersive Inc.*, No. 23-11021 (LSS) (Bankr. D. Del. Jul. 27, 2023); *In re IMV Inc.*, No. 23-10589 (KBO) (Bankr. D. Del. May 8, 2023) (same); *In re Essar Steel Algoma*, No. 14-11730 (KJC) (Bankr. D. Del. Jul. 21, 2014) (same); *In re Mega Brands Inc.*, No. 10-10485 (CSS) (Bankr. D. Del. Mar. 23, 2010) (same).

**B.      The CCAA Proceedings are Foreign Main Proceedings.**

67.      The CCAA Proceedings should be recognized as "foreign main proceedings" as defined in section 1502(4) of the Bankruptcy Code.  A foreign proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of its main interests.   11 U.S.C. § 1517(b).   The term "center of main interests" ("COMI") is not defined in the Bankruptcy Code.  COMI, however, has been equated to a debtor's principal place of business.  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), *aff'd,* 389 B.R. 325 (S.D.N.Y. 2008).  Courts have identified certain factors that are relevant in determining a debtor's COMI, including: (a) the location of the debtor's headquarters; (b) the location of those persons or entities that actually manage the debtor (which, in certain instances, could be the headquarters of a holding company); (c) the location of the debtor's primary assets; and (d) the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case. *In re Olinda Star Ltd.*, 614 B.R. 28, 41 (Bankr. S.D.N.Y. 2020) (citation omitted).  In the absence of evidence to the contrary, a debtor's registered office is presumed to be the debtor's COMI.  *See* 11 U.S.C. § 1516(c).

68.      Here, under all the relevant criteria, Vancouver, British Columbia, Canada is the Debtors' COMI.  As set forth in the Tucker Declaration:

a.      the Debtors' operations are overseen by and report to the Chief Executive Officer, located at the Nexii Group's Vancouver Headquarters;

b.      the Debtors' senior management team has historically been located Vancouver, British Columbia, Canada and, as of the Petition Date, William Tucker, as Acting Chief Executive Officer, am located in Vancouver, British Columbia, Canada;

c.      all creative, strategic, and key operating decisions and key policy decisions are made by and/or subject to approval from Nexii's senior management located in Vancouver, British Columbia, Canada;

d.   key human resources decisions pertaining to, *inter alia*, payroll budgets and augmentation or reduction of employee headcount as per the approved budget, are subject to the approval of the Debtors' senior management located in Vancouver, British Columbia, Canada;

e.   key accounting decisions and all plans, budgets, and financial projections are subject to the approval of the Debtors' senior management located in Vancouver, British Columbia, Canada;

f.   planning, budgeting, management of tax, treasury, and cash management functions, and preparation of financial projections for the Debtors is done from Vancouver, British Columbia, Canada;

g.   all material and/or long-term contracts and expenses are subject to the approval of senior management located in Vancouver, British Columbia, Canada;

h.   all of Nexii's contracts are with NBSI and are managed through the Vancouver Headquarters;

i.   marketing and business development initiatives are overseen from the headquarters in Vancouver, British Columbia, Canada;

j.   corporate governance and regulatory compliance for the Debtors is overseen from its management team located in Vancouver, British Columbia, Canada;

k.   meetings for management and senior staff of the Debtors, including board meetings, are regularly held in Vancouver, British Columbia, Canada; and

l.   senior management and all sales, manufacturing, and operations staff report to their respective senior executives, who, ultimately, report to NBSI's Acting Chief Executive Officer, who is based in Vancouver, British Columbia, Canada.

69.     Based on these factors, the Debtors' COMI is British Columbia, Canada and, as such, the CCAA Proceedings should be recognized as foreign main proceedings.

**C.     The Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative.**

70.     Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding.  Section 101(24) of the Bankruptcy Code defines "foreign representative":

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

71.     Pursuant to the Initial CCAA Order, the Court authorized the appointment of NBSI as the Foreign Representative, authorized and empowered the Foreign Representative to act as a foreign representative in respect of the CCAA Proceedings, and authorized the Foreign Representative to file these Chapter 15 Cases in the United States for the purpose of having the CCAA Proceedings recognized. Initial CCAA Order, ¶ 56. Accordingly, the Foreign Representative is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

## III.    The Verified Petition Satisfies the Requirements under Section 1515 of the Bankruptcy Code.

72.     These Chapter 15 Cases were duly and properly commenced by filing the Verified Petition, accompanied by all fees, documents, and information required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, including: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of the commencement of the Chapter 15 Cases, attached hereto as **Exhibit C**, and (iii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all of the Debtors' foreign proceedings that are known to the Foreign Representative; (d) a certified copy of the Initial CCAA Order; and (e) resolutions of the Board of Directors authorizing the commencement of the CCAA Proceedings

and these Chapter 15 Cases, attached hereto as **Exhibit B**.

73. Because the Verified Petition satisfies section 1517 of the Bankruptcy Code, the Court should recognize the CCAA Proceedings in these Chapter 15 Cases. Moreover, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code. Thus, these circumstances satisfy the conditions for mandatory recognition of the CCAA Proceedings under section 1517 of the Bankruptcy Code.

## IV. The Discretionary Relief Requested Is Necessary and Appropriate to Effect the Sale Process and Should Be Granted.

74. In connection with recognition of the CCAA Proceedings, the Foreign Representative seeks certain related relief, including enforcement of the Initial CCAA Order and the Amended and Restated Initial CCAA Order in the United States, and application of sections 361, 362, and 365(e) of the Bankruptcy Code in these Chapter 15 Cases. The Foreign Representative respectfully submits that such relief is warranted under sections 105(a), 1507, and 1521 of the Bankruptcy Code and the general principles of comity that underpin chapter 15.

75. Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors." Such relief may include:

    a.    staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a) of the Bankruptcy Code;

    b.    staying execution against the debtor's assets to the extent it has not been

stayed under section 1520(a) of the Bankruptcy Code;

    c.        suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) of the Bankruptcy Code; and

    d.        granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) of the Bankruptcy Code.

The Court may grant relief under section 1521(a) of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). Similarly, section 1507 of the Bankruptcy Code provides that, "if recognition is granted," a court "may provide additional assistance to a foreign representative under this title or under other laws of the United States." 11 U.S.C. § 1507. Finally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

76.      The Foreign Representative requests the Court exercise its discretion under sections 105, 1507, and 1521 to grant the relief requested insofar as such relief exceeds that which is available by recognizing the CCAA Proceedings as a foreign main proceeding and the Foreign Representative as a "foreign representative" as specified in the Bankruptcy Code. The granting of such relief is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is a necessary to effect the CCAA Proceedings and the Sale Process. If granted, such relief would promote all of the legislatively enumerated objectives of section 1501(a) of the Bankruptcy Code.

77.      Indeed, by the Initial CCAA Order, the Canadian Court expressly requested the assistance of the courts in the United States in the following provision:

    **THIS COURT REQUESTS** the aid and recognition of other Canadian and foreign Courts, tribunal, regulatory or administrative bodies, including any Court

or administrative tribunal of any federal or State Court or administrative body in the United States of America, to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Petitioners and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Petitioners and the Monitor and their respective agents in carrying out the terms of this Order.

Each of the Petitioners and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order and Nexii Business Solutions Inc. is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada, including acting as a foreign representative of the Petitioners to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the *United States Bankruptcy Code*, 11 U.S.C. §§ 101-1330, as amended.

Initial CCAA Order, ¶¶ 55–56.  Thus, in addition to the reasons set forth above, this Court should give full force and effect in the United States to the Initial CCAA Order in the United States under well-established principles of international comity and specifically pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

78.     Fair and efficient administration of the CCAA Proceedings that protects all parties in interest requires that all creditors be bound by the terms of the CCAA Proceedings and Sale Process as sanctioned by the Canadian Court.  *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); *In re Energy Coal S.P.A.*, 582 B.R. 619, 626–27 (Bankr. D. Del. 2018) (acknowledging the broad principles of comity applied by U.S. courts in both recognition of foreign bankruptcies and post- recognition relief granted to foreign representatives).  If the Sale Process for the sale of the Debtors' assets as contemplated by the

CCAA Proceedings and approved by the Canadian Court, and resulting sale of Debtors' assets thereunder are not fully respected in the United States, there is a risk that certain of the Debtors' creditors and contract or lease counterparties could bring proceedings in the United States against the Debtors or other parties protected by the Initial CCAA Order and the Amended and Restated Initial CCAA Order.  If such parties can effectively evade the terms of the Initial CCAA Order and the Amended and Restated Initial CCAA Order, and attempt to derail the resulting sale of Debtors' assets by commencing actions in the United States, the Debtors and others involved in the sale would be required to defend any such proceedings and deplete the resources of the restructured business and prejudice its reorganized value.  Therefore, relief requested by the Debtors is required to prevent individual creditors acting to frustrate the purposes of any sale of Debtors' assets by disregarding the binding Initial CCAA Order and Amended and Restated Initial CCAA Order, the foremost of which is the fair and efficient administration of the CCAA Proceedings and Sale Process to maximize value for all creditors.

## Conclusion

79.     The Foreign Representative respectfully submits that the Verified Petition satisfies the requirements for the recognition of NBSI as the Debtors' "foreign representative" and the CCAA Proceedings as the Debtors' "foreign main proceedings" and further requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein.

## Notice

80.     The Foreign Representative will provide notice of this Motion consistent with Bankruptcy Rule 2002(q) and Local Rule 9013-1(m).  The Foreign Representative proposes to notify all creditors and parties in interest of the filing of the Petitions and the Foreign Representative's request for entry of the Order in the form and manner set forth in the *Motion for*

*Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice*, filed contemporaneously herewith.  The Foreign Representative submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

### No Prior Request

81.     No prior request for the relief sought in this Verified Petition has been made to this or any other court.

WHEREFORE, the Foreign Representative respectfully requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

[*Remainder of page intentionally left blank.*]

Dated:  January 11, 2024                    **PACHULSKI STANG ZIEHL & JONES LLP**

                                            */s/ Steven W. Golden*
                                            Steven W. Golden (DE Bar No. 6807)
                                            Colin R. Robinson (DE Bar No. 5524)
                                            Brooke E. Wilson (*pro hac vice* pending)
                                            919 North Market Street, 17th Floor
                                            Wilmington, Delaware 19899-8705
                                            Tel:  302-652-4100
                                            Fax: 302-652-4400
                                            sgolden@pszjlaw.com
                                            crobinson@pszjlaw.com
                                            bwilson@pszjlaw.com

                                            -and-

                                            **BARACK FERRAZZANO KIRSCHBAUM
                                            & NAGELBERG LLP**

                                            Nathan Q. Rugg (*pro hac vice* pending)
                                            Alexander F. Berk (*pro hac vice* pending)
                                            John Andreasen (*pro hac vice* pending)
                                            200 West Madison Street, Suite 3900
                                            Chicago, IL 60606
                                            Tel.: (312) 984-3100
                                            Fax: (312) 984-3150
                                            nathan.rugg@bfkn.com
                                            alexander.berk@bfkn.com
                                            john.andreasen@bfkn.com

                                            *Attorneys for Foreign Representative*

## **VERIFICATION OF PETITION**

I, William Tucker, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

I am the Acting Chief Executive Officer of Nexii Building Solutions Inc., the authorized foreign representative for the Debtors. As such, I have full authority to verify the foregoing Verified Petition on behalf of the Foreign Representative.

I have read the foregoing Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 11, 2024
Vancouver, Canada

William Tucker (Jan 10, 2024 19:46 PST)

By: William Tucker
Title: Acting Chief Executive Officer
Nexii Building Solutions Inc.

35