**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: <br><br> NEXII BUILDING SOLUTIONS INC., et al.,[1] <br><br> Debtors in a Foreign Proceeding. | Chapter 15 <br><br> Case No. 24-10026 <br><br> (Joint Administration Requested) |

**DECLARATION OF KIBBEN JACKSON IN SUPPORT OF VERIFIED
PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDINGS,
(II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND
<u>(III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE</u>**

I, Kibben Jackson, to the best of my information and belief, state as follows:

1. I submit this declaration (this "<u>Declaration</u>") in support of the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "<u>Verified Petition</u>")[2] filed by Nexii Building Solutions Inc., in its capacity as the authorized foreign representative (the "<u>Foreign Representative</u>") of the above-captioned debtors (collectively, the "<u>Debtors</u>" or "<u>Nexii</u>"), who are the subject of jointly-administered proceedings under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended, the "<u>CCAA</u>") in the Supreme Court of British Columbia, (the "<u>CCAA Proceedings</u>" and such court, the "<u>Canadian Court</u>"). Concurrently herewith, the Foreign Representative has filed voluntary petitions for relief under chapter 15 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") for each of the Debtors. All facts set forth in this Declaration are based on: (a) my knowledge; (b) my review of

---

[1] The Debtors in these chapter 15 cases (the "<u>Chapter 15 Cases</u>"), along with the last four digits of each Debtor's unique identifier, are Nexii Building Solutions Inc. (0911), Nexii Construction Inc. (1333), NBS IP Inc. (9930), and Nexii Holdings Inc. (5873). The Debtors' service address for purposes of these Chapter 15 Cases is 1455 West Georgia Street, #200, Vancouver, British Columbia V6G 2T3.

[2] For the avoidance of doubt, capitalized terms used but not defined herein shall have the meaning given to them in the Verified Petition.

DE:4860-3823-4266.7 60009.00001

relevant documents; and/or (c) my opinion based upon my experience and knowledge of the Debtors' operations. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

2. I am a partner in the firm of Fasken Martineau DuMoulin LLP ("Fasken"), 500 Burrard Street, Suite 2900, Vancouver, BC, V6C 0A3, where my broad-ranging practice focuses on restructuring and insolvency matters. Fasken acts as Canadian counsel to the Debtors, whose CCAA Proceedings are pending before the Canadian Court. I appeared before the Canadian Court as counsel of record seeking the Initial CCAA Order. I graduated from the University of British Columbia in 1998. I was admitted to the British Columbia Bar in 2001. I have experience acting for debtor corporations and large corporate groups, lenders, bondholders, and other creditors, court appointed officers (*e.g.*, CCAA monitors), investors, and acquirers. Over the course of my career, I have been involved in numerous arrangement proceedings under the CCAA, as well as proceedings under federal and provincial corporate and/or insolvency legislation, including appearing as counsel of record in at least 20 such proceedings in the last year.

I.      **CCAA PROCEEDINGS**

    A.      **Overview of CCAA Restructuring Process**

3. The CCAA process begins when a company files an initial application—often on an *ex parte* basis—in the court in the jurisdiction where the company's headquarters or principal place of business is situated for protection under the CCAA. The initial application must, *inter alia*, be accompanied by: (a) projected weekly cash flow statements; (b) a statement regarding the preparation of the cash-flow statements; and (c) copies of all audited or unaudited financial statements prepared during the year prior to the application. *See* CCAA at 10(2).

4.     Upon the filing of the initial application, the court may enter an order staying all proceedings and actions against the company and its property as well as against its directors and officers for an initial period that does not exceed 10 days. *See* CCAA at 11.02(1). This period may subsequently, from time to time, be extended by the CCAA court for such period of time as the CCAA court deems appropriate in the context of the company's restructuring process.

5.     Once the court enters an initial order approving the initial application, the court will at the same time appoint a licensed insolvency trustee to serve as a "monitor" of the business and financial affairs of the company.[3]

6.     The Initial CCAA Order and the Amended and Restated Initial CCAA Order may also include, among other things, (a) authority to disclaim certain contracts; (b) a prohibition on the payment of prefiling obligations, subject to certain permitted exceptions; (c) authority to pay any outstanding wages, salaries, employee and pension benefits, as well as other entitlements and expenses; (d) authority order to pay certain taxes; and (e) a prohibition on sales outside the ordinary course of business without court approval. *See* CCAA at 11.09(2).

7.     Prior to 2009, there was an on-going debate over whether creditor protection under the CCAA was appropriate to allow for an orderly liquidation of a debtor company. In 2009, the CCAA was amended to include, *inter alia*, statutory rights in favor of debtor companies to sell their assets outside of the ordinary course of business and outside of a CCAA plan. Accordingly, since then, Canadian courts have come to accept that the business and assets of an insolvent company can be sold under the CCAA free and clear of any lien, security, charge, or other

---

[3] A monitor is an independent third party who is appointed by the court to monitor the company's ongoing operations and assist with the filing and voting on the plan of arrangement. The monitor's duties include, monitoring the business, reporting to the court on any major events that might impact the viability of the company, assisting the company in the preparation of the plan of arrangement, notifying the creditors (and shareholders) of any meetings and tabulating the votes at these meetings. The monitor will also prepare a report on any sale transaction involving an insolvent debtor's assets conducted out of the ordinary course and on the plan of arrangement advising the court on the reasonableness of such step.

DE:4860-3823-4266.7 60009.00001

restriction, without the need to file a CCAA plan. The CCAA now allows a debtor to dispose of all or substantially all of its assets outside of the ordinary course of business without the formal approval of its creditors, provided it obtains prior authorization from the court. In deciding whether to authorize the proposed sale of assets, the CCAA stipulates that the CCAA court is to consider, among other things:

    a. whether the process leading to the proposed sale or disposition was reasonable under the circumstances;

    b. whether the CCAA monitor has approved the process leading to the proposed sale or disposition;

    c. whether the CCAA monitor filed with the CCAA court a report stating that in its opinion, the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy;

    d. the extent to which the creditors were consulted;

    e. the effects of the proposed sale or disposition on the creditors and other interested parties; and

    f. whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.

8. These criteria are largely based on the principles which were previously enunciated by the Ontario Court of Appeal in the *Soundair* matter,[4] in which the court listed the following non-exhaustive criteria to examine in order to determine whether a sale of assets of an insolvent debtor should be approved:

    a. whether sufficient effort has been made to obtain the best price and that the debtor has not acted improvidently;

    b. the interests of all parties;

    c. the efficacy and integrity of the process by which offers have been obtained; and

---

[4] *Royal Bank of Canada v. Soundair Corp.* (1991), 4 O.R. (3d) 1 (C.A.).
DE:4860-3823-4266.7 60009.00001

        d.  whether there has been unfairness in the working out of the process.

9. If the required test is met, the court will normally issue an approval and vesting order authorizing the transfer of the assets on a free and clear basis (other than assumed/permitted encumbrances). The order will also provide that creditor claims will have the same priority against the proceeds of the transaction that they had against the assets, prior to the sale.

10. It should be noted that court authorization will be granted only if the CCAA court is satisfied that the company can and will pay for any unpaid wages or pension plan contributions that would have been required if the court had approved a proposal or a plan of arrangement and compromise, as applicable. It should also be noted that if the sale transaction ultimately presented to the court for approval is with a related party, certain additional requirements must be met.

11. While, as mentioned, the sale of assets of a debtor company does not require the formal approval of its creditors, the CCAA requires that a notice of application to the CCAA court for the approval of the sale or disposition of assets be given by the debtor to all of its secured creditors who are likely to be affected by the proposed sale or disposition. Likewise, and as discussed below, the Debtors will seek CCAA court approval of the procedures that will govern the Sale Process.

12. In a CCAA proceeding, a debtor is able to obtain postpetition financing (*i.e.*, DIP financing), subject to a hearing and court approval, after showing that the proposed financing is in the best interests of the debtor. *See* CCAA at 11.2. Such borrowings would typically have priority status in the CCAA proceeding and, if unsecured financing is unavailable, the debtor is permitted to borrow on a secured basis. *See* CCAA at 11(2). Debtors have been able to obtain court approval of such postpetition financing on the basis of a term sheet. *See, e.g., U.S. Steel Canada Inc., Re*, 2014 ONSC 6145 (¶¶ 4 and 18); *In the Matter of a Plan of Arrangement of the UrtheCast Corp.*, 2020 BCSC 2012 (¶ 25). The court may approve priority charges against the company's assets in

DE:4860-3823-4266.7 60009.00001

5

respect of such financing, which may take priority over existing secured creditors, where notice of the charge approval hearing is given to the potentially affected creditors and the court is of the opinion that such charges are appropriate in the circumstances. *See* CCAA at 11.2(1).

### B.      Commencement and Overview of CCAA Restructuring Proceedings

13.     Beginning in 2021, the Debtors pursued aggressive growth, including expansion of their facilities and operations. (*See* Tucker Declaration, ¶ 16). The financing from investors and the Senior Secured Lenders funded this expansion. (Verified Petition ¶ 33) Following this expansion effort, Nexii's business grew, but not to the extent anticipated, and the costs were high relative to revenue. (Tucker Declaration, ¶17). The Debtors were also unable to service their obligations under the Loan Agreement. (*Id.*, ¶ 18)

14.     In response to its financial challenges, Nexii implemented cost reduction measures, and began discussions with the Senior Secured Lenders, including to develop a strategy to preserve value. (Verified Petition, ¶ 38). Despite these steps, in or about April 2023, the other Debtors failed to make the scheduled payment owing under the Loan Agreement. (*Id.* at ¶ 39). Following the failure to pay amounts due and owing under the Loan Agreement, the Senior Secured Lenders noticed events of default under the Loan Agreement and mad a formal demand for payment. (Tucker Declaration, ¶ 18). These defaults have continued to the present. (Verified Petition, ¶ 39).

15.     Nexii requires additional funding to meet critical obligations (including payroll), which, at this time, will only be available in these proceedings through the Interim Loan, secured by a charge in the CCAA Proceedings. (*Id.*, ¶ 46).

16.     The Debtors and the Senior Secured Lenders entered into a Support Term Sheet pursuant to which the Senior Secured Lenders agreed to support Nexii in commencing the CCAA Proceedings and these Chapter 15 Cases.  The Support Term Sheet contemplates, among other

things, commencing the insolvency proceedings in Canada and the United States and provision of certain interim financing.

17. Accordingly, with the support of the Senior Secured Lenders, the Debtors commenced the CCAA Proceedings to obtain financing to meet critical expenses and to conduct the Sale Process. The Sale Process is intended to facilitate the sale (or sales) of the Debtors' business as a going concern. Doing so will preserve value and, to the extent possible, operations as a going concern, to the benefit of stakeholders in Canada and the United States, including employees, customers, suppliers, and contracting parties.

18. The Sale Process procedures will be attached to a report to be filed by KSV Restructuring Inc., the Monitor appointed in the CCAA Proceedings. The Debtors propose to seek approval of these procedures at the Comeback Hearing.

19. Entry of an order recognizing the CCAA Proceedings and granting the relief requested in the Verified Petition is a condition precedent to the Debtors' receipt of critical debtor in possession financing and is sought in order to preserve the Debtors' operations while they undertake the Sale Process.

20. On January 11, 2024, the Canadian Court entered the Initial CCAA Order. The Initial CCAA Order includes a "no default" provision and is attached to the Provisional Relief Motion as Exhibit 1. More specifically paragraph 18 of the Initial CCAA Order provides as follows:

> The granting of this Order, the Application and any affidavits and other materials filed in support of the Application shall not, in and of themselves, constitute a default or failure to comply by the Debtors under any statute, regulation, license, permit, contract, permission, covenant, agreement, undertaking or other written document or requirement.

Initial CCAA Order, ¶ 18.

21. In addition, the Initial CCAA Order expressly requests that courts in the United States recognize the CCAA Proceedings to aid and assist the Canadian Court in carrying out the terms of the Initial CCAA Order. Paragraphs 55 and 56 of the Initial CCAA Order provides, in relevant part:

> **THIS COURT REQUESTS** the aid and recognition of other Canadian and foreign Courts, tribunal, regulatory or administrative bodies, including any Court or administrative tribunal of any federal or State Court or administrative body in the United States of America, to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Petitioners and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Petitioners and the Monitor and their respective agents in carrying out the terms of this Order.
>
> Each of the Petitioners and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order and Nexii Business Solutions Inc. is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada, including acting as a foreign representative of the Petitioners to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the *United States Bankruptcy Code*, 11 U.S.C. §§ 101-1330, as amended.

Initial CCAA Order, ¶¶ 55 – 56.

22. The Debtors will seek entry by the Canadian Court of the Amended and Restated Initial CCAA Order approximately ten days from the date of entry of the Initial CCAA Order.

23. I believe recognition of the CCAA Proceedings will not undermine the rights that United States creditors typically enjoy in a chapter 11 proceeding, as affected creditors will have the opportunity to the participate in the CCAA Proceedings under the supervision of the Canadian Court.

## C. Initial Relief Sought in CCAA Restructuring Process

24. The Debtors sought the following relief through their initial application in the Canadian Proceeding:

   a. ***Appointment of Monitor and Enhanced Powers.*** The Debtors obtained an order appointing KSV Restructuring Inc. ("KSV") as Monitor of the Debtors in the Canadian Proceedings and for KSV's powers to include, among other things, the ability to exercise of any powers of the Debtors' boards of directors and to cause the Debtors' to perform such functions as KSV considers necessary to facilitate the Sale Process and the ultimate sale of the Debtors or their assets.

   b. ***Stay of Proceedings.*** The Debtors obtained a stay of proceedings during the pendency of the Canadian Proceedings both for themselves and for the Omicron Entities.

   c. ***Cash Management System.*** The Debtors' were authorized to continue use of their pre-bankruptcy cash management system and fund certain of their ongoing obligations otherwise paid through their existing cash management system.

   d. ***Cash Flow Forecast and Interim Loan Approval.*** The Debtors obtained approval of the Interim Loan on the terms described in the Support Term Sheet and summarized below:

| Summary of Certain Key Terms of the DIP Loan[5] | |
|---|---|
| Lenders | Powerscourt Investments XXV Trust, Trinity Capital Inc., Horizon Technology Finance Corporation and Horizon Credit II LLC |
| Borrowers | The Petitioners, jointly and severally. |
| Maximum Availability | Maximum Amount: $4,300,000 (non-revolving)<br>Initial Advance: $750,000 |
| Interest | 15.5% per annum, compounded and calculated weekly; added to the principal amount on the first day of each month |
| Fees | 2% of the Maximum Amount ($86,000)<br>Payable: $15,000 from the Initial Advance, and the balance payable from the first advance after the Amended and Restated Initial Order is made authorizing the Maximum Amount |
| Costs and Expenses | All reasonable and documented fees, costs and expenses of the Interim Lenders, including legal fees and financial advisor, that are incurred in connection with these CCAA proceedings. |

---

[5] Capitalized terms used but not defined in this summary chart shall have the meaning given to them in the Support Term Sheet. Copies of the Support Term Sheet will be made available to the Court or appropriate parties in interest upon written request to the Debtors' counsel. The Support Term Sheet may also be found on the Monitor's website at www.ksvadvisory.com/experience/case/Nexii.

| Summary of Certain Key Terms of the DIP Loan[5] | |
|---|---|
| Use of Funds | In accordance with cash flow projections, and include costs of the CCAA proceedings, operating expenses and amounts payable under the Interim Facility Term Sheet. |
| Maturity | April 30, 2024, unless extended by the Interim Lenders (in their discretion) or terminated earlier because of, among other things, an Event of Default, closing of a transaction for all or substantially all of the assets and business of the Borrowers. |
| Certain Key Conditions Precedent to Initial Advance | <ul><li>Bringing the application for the Initial Order no later than January 11, 2024</li><li>KSV Restructuring Inc. being appointed as Monitor, with powers as are acceptable to the Interim Lenders (in their sole discretion)</li><li>The Borrowers engaging the IB prior to the Initial Order to assist in the Sale Process</li><li>The Initial Order is made and approves the Initial Advance and grants a charge for the Initial Advance</li><li>The Interim Lenders' Charge has priority over all Liens, except the Charges</li><li>The Initial Cash Flow Projections shall be acceptable to the Interim Lenders</li></ul> |
| Certain Key Conditions Precedent to Subsequent Advances | <ul><li>Bringing the application for the Amended and Restated Initial Order no later than January 22, 2024</li><li>The Amended and Restated Initial Order is made and approves the Maximum Advance and increased the charge to secure all amounts owing under the Interim Facility Term Sheet</li><li>The Interim Lenders' Charge shall have priority over all Liens, except for the Charges</li><li>The amounts requested are consistent with the Updated Cash Flow Projects, unless otherwise agreed by the Interim Lenders in advance</li><li>The Sale Process terms and conditions, including milestones, are approved by the Court in form and substance satisfactory to the Monitor and the Interim Lenders</li><li>All representations and warranties are true, and there are no events of default</li><li>The Borrowers bring a motion to obtain Chapter 15 Recognition of the CCAA proceedings no later than February 2, 2024</li></ul> |

| Summary of Certain Key Terms of the DIP Loan[5] | |
|---|---|
| Events of Default | Events of Default include:<br>1. Failure to pay amounts when due under the Interim Facility Term Sheet or any other breach of covenants<br>2. If the Sale Process is not made by January 22, 2024<br>3. If I resign as CEO of Nexii prior to the Maturity Date<br>4. If the cumulative disbursements and receipts have a variance of greater than 15% of the cumulative budget, measured on a weekly basis<br>5. If the Interim Facility Term Sheet or related documents cease to be effective or are contested by a Borrower<br>6. The CCAA Proceedings are terminated or converted into proceedings under the BIA, or an order is made granting relief from the stay of proceedings (unless agreed by the Interim Lenders)<br>7. The Borrowers make material payments that aren't permitted under the Interim Facility Term Sheet, the Cash Flow Projections or any Court order<br>8. The Borrowers make any distributions or payments to the Omicron Entities |
| Security and Interim Lenders' Charge | The Interim Lenders' Charge, covering all the Borrowers' present and future assets, property and undertaking. |
| Priority of the Interim Lenders' Charge | In priority to all other security interests, encumbrances and charges except for (i) the Administration Charge, (ii) the Directors' Charge, (iii) the KERP Charge, and (iv) the IB Charge. |

e. ***Administration Charge.*** The Debtors obtained approval of a priority charge over their assets in favor of their counsel, the Monitor, and the Monitor's counsel in the initial amount of CA$500,000 as the Debtors require the expertise, knowledge and continuing participation of their counsel, the Monitor and the Monitor's counsel in the Canadian Proceedings and the Chapter 15 Cases.

f. ***Directors' Charge.*** The Debtors obtained approval of a charge in the amount of CA$1,040,000 over the Debtors' Property to secure the indemnity of the Directors and Officers in respect of obligations and liabilities that they may incur during the Canadian Proceedings in their capacities as Directors and Officers.

**D.    Relief to be Sought at Comeback Hearing**

25.    My understanding is that the Debtors will seek the following relief at the Comeback Hearing:

a. ***Key Employee Retention Plan.*** The Debtors will seek approval of a Key Employee Retention Plan to assist with the Sale Process and administration of the

      Canadian Proceedings.

b.    *Sale Process.*   The Debtors will seek approval of procedures to govern the Sale Process.

c.    *Financial Advisor.*   The Debtors will seek approval to retain Origin Merchant Partners as their investment banker in connection with the Sale Process and Canadian Proceedings more broadly.

## II.    THE CCAA PROCEEDINGS ARE FOREIGN MAIN PROCEEDINGS.

26.    To ensure the effective and economic administration of the Debtors' restructuring efforts, I believe that the Debtors require the protection afforded to foreign debtors pursuant to chapter 15 of the Bankruptcy Code in order to prevent disruption of business and recognize the legal effect of the CCAA Proceedings in the United States.

27.    To the best of my information and belief, the CCAA Proceedings are collective judicial proceedings under Canadian law relating to the adjustment of debt of the Debtors in which the purpose is a corporate restructuring.

28.    To the best of my information and belief, and as identified in the Tucker Declaration filed contemporaneously herewith, other than these Chapter 15 Cases, the CCAA Proceedings are the only proceedings related to the adjustment of debts pending for the Debtors and, therefore, are the only "foreign proceedings" with respect to the Debtors within the meaning of section 101(23) of the Bankruptcy Code.

29.    Additionally, I understand that a statement identifying all foreign proceedings with respect to the Debtors has been filed with this Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my information and belief.

Executed on this 11th day of January, 2024 British Columbia, Canada

*Kibben Jackson*
Kibben Jackson
Partner
Fasken Martineau DuMoulin LLP